[No. 25718-1-II.   Division Two.   August 24, 2001.]

*In the Matter of the Detention of* C.K., *Appellant.*

66

*James M. Bendell*, for appellant (appointed counsel for appeal).

*Juelanne B. Dalzell, Prosecuting Attorney*, for respondent.

HUNT, J. — C.K. appeals a 180-day involuntary commitment under a less-restrictive-treatment alternative plan. He contends that: (1) he was not gravely disabled at the time of the hearing; and (2) the trial court improperly considered his past behaviors when discontinuing medication to control his bipolar disorder. Finding clear and convincing evidence to support the alternative treatment, we affirm.

## FACTS

C.K. has bipolar disorder. He does not require inpatient hospitalization when taking medication. But he stops taking his medication when not under court order and becomes openly confrontational and dangerous to others. He was placed on successive 90-day less-restrictive-alternative (LRA) treatment plans, which allowed him to live independently while under court order to continue his medication.

After C.K.'s 90-day treatment ended, county mental health authorities petitioned for 180 days of involuntary LRA treatment, alleging that he "continues to be gravely disabled as a result of a mental disorder." At the February 18, 2000, hearing on the petition, supervising County Designated Mental Health Professional (CDMHP) Gary Leu testified that without a court order, C.K. was unwilling to take medication to treat his bipolar disorder. Leu testified further about C.K.'s "decompensation"[1] that occurs when he does not take his medication.[2]

The superior court commissioner presiding at the hearing outlined C.K.'s nonmedicated behavior as follows:

> On June 11, 1998, Jefferson CDMHP again detained K. to KRTC[3] for being gravely disabled and presenting a danger to others. He was threatening sexual acts upon young girls. He was released from KRTC on June 15, 1998 on a 90 day LRA

---

[1] "Decompensation" is not defined in the involuntary treatment act, chapter 71.05 RCW, but it is defined as the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms." STEDMAN'S MEDICAL DICTIONARY (26th ed. 1995). *In re Det. of LaBelle*, 107 Wn.2d 196, 206, 728 P.2d 138 (1986) defined decompensation by using the language from the statutory definition of "gravely disabled" that was found in RCW 71.05.020(1)(b) (Since recodified as RCW 71-.05.020(14). *See infra* note 5.): "progressive deterioration of routine functioning supported by evidence of repeated or escalating loss of cognitive or volitional control of actions, . . . ."

[2] Leu testified:

I have examined Mr. K at the height of his, . . . at his most decompensated state, um, I am concerned about his judgement at that time. His last detention was a—was an example of that impaired judgement in that he was trespassing; he was agitating business owners that could of easily come to, . . . he could of easily gotten into a fight or altercation with that . . . .

Report of Proceedings at 29-30.

[3] Kitsap Residential Treatment Center.

plan, the major component of which was medication. That LRA expired September 14, 1998. On November 9, 1998, K. was again the subject of a CDMPH investigation. The victim refused to testify. On December 9, 1999, he was again detained by KRTC and charged with criminal trespass as a result of causing a commotion at a local store. Again he was placed on a 90 day LRA plan, which is the subject of this action.

Clerk's Papers at 8.

The court commissioner noted that "[c]ertainly, as [C.K.] sat in the courtroom on February 18th, [he] was not gravely disabled. He was on his medications." Clerk's Papers at 9. Nonetheless, the commissioner signed an order allowing for a 180-day LRA involuntary treatment for C.K.[4] under chapter 71.05 RCW, citing as reasons:

> As a result of said mental disorder, the Respondent is both a danger to himself and others and consequently is gravely disabled.

Clerk's Papers at 11. C.K. appealed.

## ANALYSIS

### I. "Gravely Disabled"

■ ■ C.K. claims that under the standards of *In re Detention of LaBelle*, 107 Wn.2d 196, 728 P.2d 138 (1986), he was not "*presently* gravely disabled or a danger to himself or others" at the time of his commitment hearing.

"Gravely disabled" means a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her

---

[4] Before C.K.'s commitment ended on August 29, 2000, the State brought a petition for a second 180-day LRA, which was granted; that case is on appeal in Court of Appeals Docket No. 26388-2-II and, as the parties informed us, involves the same issues as the instant appeal. Rather than consolidate the appeals at this time, we will first decide the instant case, then determine later, with advice of the parties, how to treat the second appeal.

actions and is not receiving such care as is essential for his or her health or safety[.]

RCW 71.05.020(14).

Lacking a specific citation, the commissioner's ruling appears to focus on the essence of subsection (a). The State contends that C.K. is gravely disabled under subsection (b), because C.K. lacks insight into his need for medication to treat his mental disorder.

## A. *LaBelle*

Construing the 1979 statutory definition of "gravely disabled," the Supreme Court in *LaBelle* appears to have encompassed both types of grave disability that the Legislature subsequently clarified in RCW 71.05.020(14) under subsections (a), "danger of serious physical harm," and (b), "severe deterioration in routine functioning," as noted by the commissioner below and the State, respectively.[5] "[U]n-

---

[5] The 1979 Legislature adopted the current definition of "gravely disabled," RCW 71.05.020(14), in Laws of 1979, Ex. Sess., ch. 215, § 5. Since that time, this statute has been renumbered, but has not changed substantively.

"Gravely disabled" appeared in section 1 of the definition section of the involuntary treatment act from 1979 to 1997, when it changed to section 8 (Laws of 1997, ch. 112, § 3). In 1998 it changed to section 9 (Laws of 1998, ch. 297, § 3), and in 2000 it changed to section 14 (Laws of 2000, ch. 94, § 1). RCW 71.05.020(8)(b) is an older citation to the "gravely disabled" definition.

The Supreme Court decided *LaBelle* in 1986 and construed the 1979 statutory definition as follows:

[W]e construe the gravely disabled standard of RCW 71.05.020(1)(a) to require a showing of a substantial risk of danger of serious physical harm resulting from failure to provide for essential health and safety needs.

In so holding, *we do not require . . . that the substantial risk of harm be evidenced by recent, overt acts.* Such a requirement . . . has little relevance where, as here, any *risk of danger arises primarily from passive neglect or inaction* rather than from acts, attempts or threats of harm. . . . [T]he State must present *recent, tangible evidence of failure or inability to provide for such essential human needs as* food, clothing, shelter, and *medical treatment* which presents a *high probability of serious physical harm* within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors. ·

*LaBelle*, 107 Wn.2d at 204-05 (emphasis added). *Compare* RCW 71.05.020(1), cited in *LaBelle*, 107 Wn.2d at 202, *with* the current RCW 71.05.020(14) definition in the 2000 Revised Code of Washington.

der the gravely disabled standard, the danger of harm usually arises from *passive* behavior—*i.e.*, the failure or inability to provide for one's essential needs." *LaBelle*, 107 Wn.2d at 204.

The Supreme Court noted that the statutory definition of "gravely disabled" specifically incorporates persons who "decompensate" when they fail to take their medication:

> The definition of gravely disabled in RCW 71.05.020(1)(b) was added by the Legislature in 1979. *See* Laws of 1979, 1st Ex. Sess., ch. 215, § 5. It was intended to broaden the scope of the involuntary commitment standards in order to reach those persons in need of treatment for their mental disorders who did not fit within the existing, restrictive statutory criteria. *See* Washington State Legislature, *Final Legislative Report 1979*, at 153. *See generally* Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 Yale L. & Pol'y Rev. 395 (1985). By incorporating the definition of "decompensation," which is the progressive deterioration of routine functioning supported by evidence of repeated or escalating loss of cognitive or volitional control of actions, RCW 71.05.020(1)(b) permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit "rapid deterioration in their ability to function independently." Durham & LaFond, 3 Yale L. & Pol'y Rev., at 410.

*LaBelle*, 107 Wn.2d at 205-06.[6]

## B. Post-*LaBelle* Legislation

*LaBelle* foreshadowed the specialized mental-health meaning of "likelihood of serious harm" that the Legislature subsequently explained in RCW 71.05.245:

> In making a determination of whether there is a likelihood of serious harm in a hearing conducted under RCW 71.05.240 or 71.05.320, the court shall give great weight to any evidence

---

[6] The definition of "gravely disabled" to which the Supreme Court referred in *LaBelle* was codified as RCW 71.05.020(1).

before the court regarding whether the person has: (1) A recent history of one or more violent acts; or (2) a recent history of one or more commitments under this chapter or its equivalent provisions under the laws of another state which were based on a likelihood of serious harm. *The existence of prior violent acts or commitments under this chapter or its equivalent shall not be the sole basis for determining whether a person presents a likelihood of serious harm.*

(Emphasis added.)

Following *LaBelle*, in 1997 the Legislature clarified its intent for LRA treatment:

It is the intent of the legislature to enhance continuity of care for persons with serious mental disorders that can be controlled or stabilized in a less restrictive alternative commitment. Within the guidelines stated in *In Re LaBelle*[,] 107 Wn.2d 196 (1986), the legislature intends to encourage appropriate interventions at a point when there is the best opportunity to restore the person to or maintain satisfactory functioning.

*For persons with a prior history or pattern of repeated hospitalizations or law enforcement interventions due to decompensation, the consideration of prior mental history is particularly relevant* in determining whether the person would receive, if released, such care as is essential for his or her health or safety.

Therefore, the legislature finds that for persons who are currently under a commitment order, a prior history of decompensation leading to repeated hospitalizations or law enforcement interventions should be given great weight in determining whether a new less restrictive alternative commitment should be ordered.

RCW 71.05.012 (emphasis added).

Also in 1997, the Legislature enacted RCW 71.05.285,[7]

---

[7] RCW 71.05.285 provides:

For the purposes of continued less restrictive alternative commitment under the process provided in RCW 71.05.280 and 71.05.320(2), in determining whether or not the person is gravely disabled, great weight shall be given to evidence of a prior history or pattern of decompensation and discontinuation of treatment resulting in: (1) Repeated hospitalizations; or (2) repeated peace offi-

which reiterates that in determining whether a person is gravely disabled, courts can consider that person's "prior history or pattern of decompensation and discontinuation of treatment." Such prior history of decompensation is directly relevant to C.K., who apparently can safely remain in the community when on medication, but who decompensates without it when no longer under court-ordered treatment. Report of Proceedings at 28-29.

### C. Commissioner's Consideration of RCW 71.05.012 Legislative Findings

██ ██ At C.K.'s hearing below, the State read RCW 71.05.012 into the record, and the court commissioner cited the legislative findings of RCW 71.05.012 in his memorandum opinion. C.K. contends that this was error. We disagree. The commissioner correctly applied the statutory standard that "great weight" shall be given to "a prior history or pattern" of "decompensation," "repeated hospitalizations," or repeated "interventions" by law enforcement officers. Ch. 71.05 RCW.[8]

In *In re Detention of R.W.*, 98 Wn. App. 140, 988 P.2d 1034 (1999), we held that it was error to include the legislative findings of RCW 71.05.012 in the jury instructions, because they constituted an impermissible comment on the evidence by the court "in violation of Article IV, Section 16 of the Washington State Constitution." *R.W.*, 98 Wn. App. at 144.

cer interventions resulting in juvenile offenses, criminal charges, diversion programs, or jail admissions. Such evidence may be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety.

In 2001 the Legislature enacted Laws of 2001, ch. 12, which amended RCW 71.05.285 in response to *In re Detention of R.W.*, 98 Wn. App. 140, 988 P.2d 1034 (1999).

[8] The same standards for applying great weight to a prior history or pattern of decompensation in determining the need for additional confinement or treatment are found in RCW 71.05.012 (the legislative intent section of chapter 71.05 RCW) and in RCW 71.05.285, which codifies the standard. Although the commissioner cited specifically to RCW 71.05.012, there is no significant difference between the two sections. *R.W.* did not consider RCW 71.05.285 because the parties agreed that this section was "inapplicable." *R.W.*, 98 Wn. App. at 144 n.2.

But here, there was no jury. Instead, a court commissioner conducted the hearing on the petition, and there was no improper comment on the evidence to a jury. Legislative intent " 'may serve as an important guide in understanding the intended effect of operative sections' " of a statute. *R.W.*, 98 Wn. App. at 145 (quoting *State v. Alvarez*, 74 Wn. App. 250, 258, 872 P.2d 1123 (1994), and citing other cases).

*R.W.* does not prohibit the commissioner's appropriate consideration of a "prior history or pattern" of "repeated hospitalizations" or law enforcement interventions due to decompensation under chapter 71.05 RCW.

## II. SUFFICIENCY OF EVIDENCE

### A. Standard of Review

"[W]e will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *LaBelle*, 107 Wn.2d at 209.

"The burden of proving that a person is gravely disabled and in need of treatment is on the petitioner." *Morris v. Blaker*, 118 Wn.2d 133, 137, 821 P.2d 482 (1992) (citing *LaBelle*, 107 Wn.2d at 209). *LaBelle* outlined a two-part test for determining whether an individual is "gravely disabled." First, there must be a factual basis for concluding that the individual "manifests severe [mental] deterioration in routine functioning," which "must include" (a) recent proof of "significant loss of cognitive or volitional control"; and (b) a factual basis for "concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *LaBelle*, 107 Wn.2d at 208. Second, the State must show that "the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *LaBelle*, 107 Wn.2d at 208.

## B. Evidence of C.K.'s Grave Disability

■ ■ Here the record contains the following evidence that C.K. manifested "loss of cognitive or volitional control." His landlord requested that the mental health people "do something" about C.K., because when C.K. does not take his medication, his apartment becomes a shambles and he disturbs the other tenants. CDMHP Gary Leu testified that when C.K. fails to take his medication, his apartment deteriorates to a "horrible" condition and he becomes "threatening," making "outrageous statements . . . to other people."

In June 1998, C.K. was detained for being gravely disabled, being a danger to others, and threatening sexual acts on young girls. In November 1998, there was an investigation concerning C.K.'s assault of a neighbor, who later refused to testify. Also while not under treatment, C.K. was trespassing and agitating a business owner, which precipitated C.K.'s previous 90-day involuntary commitment in December 1999.

It is uncontroverted that C.K. decompensates when he stops taking his medication. C.K. did not counter the State's expert mental health professionals, who testified that C.K. posed a risk of harm to himself or others *if* he stopped taking his prescribed medication. And C.K. clearly said that he would stop taking his medication unless under court order. As reflected in the commissioner's memorandum opinion, "the evidence showed that [C.K.] was repeatedly hospitalized due to decompensation." It was appropriate to consider C.K.'s prior history of decompensation under both RCW 71.05.285 and RCW 71.05.012, which uses a similar phrase—"a prior history or pattern of repeated hospitalizations or law enforcement interventions due to decompensation."

In determining that C.K. was gravely disabled and in ordering a LRA treatment for him, the commissioner properly gave "great weight" to "evidence of [C.K.'s] prior history or pattern of decompensation" under RCW 71.05.285. Simi-

lar to C.K., LaBelle's condition improved while undergoing treatment; unlike C.K., LaBelle was confined to a hospital. Also similar to C.K., based on his past behavior, the evidence showed that LaBelle would again deteriorate if released from treatment. Again, similar to C.K., in a companion case consolidated with *LaBelle,* the Court ruled:

> There is also evidence that Marshall lacked any awareness of his need for the necessary medication to stabilize his symptoms.
>
> . . . Dr. Mandell testified that inpatient care is necessary because Marshall's condition, although in the process of stabilizing, would decompensate rapidly upon release without treatment. It is also necessary, in his opinion, because Marshall is opposed to medication or follow-up treatment . . . .
>
> . . . .
>
> . . . There is clear, cogent and convincing evidence that medication is necessary to stabilize the mental deterioration and the conduct therefrom that resulted in his initial confinement. It is also evident that Marshall is unable to understand his need for treatment and, if released, would not follow through with the prescribed treatment.

*LaBelle,* 107 Wn.2d at 211-13.

C.K. argues that the court below had no authority to order treatment because he was not gravely disabled *at the time of the hearing,* during which time he was on medication and not manifesting deterioration of mental function. But C.K.'s focus on contemporaneous disability is too narrow. On the contrary, the Legislature defined "recent history" of violent acts or prior commitments to include the three years preceding the hearing. RCW 71.05.245. Moreover, C.K.'s argument contravenes the Legislature's purpose for chapter 71.05 RCW to provide intervention before a patient's condition reaches "crisis proportions":

> By permitting intervention before a mentally ill person's condition reaches crisis proportions, RCW 71.05.020(1)(b) enables the State to provide the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning. Such intervention is consonant with one of

the express legislative purposes of the involuntary treatment act, which is to "provide continuity of care for persons with serious mental disorders." RCW 71.05.010(4).

*LaBelle*, 107 Wn.2d at 206.

That C.K. did not manifest his mental disorder at the involuntary-treatment hearing does not undermine the court's order for a 180-day LRA treatment. Rather, the court below properly considered C.K.'s past patterns of behavior, taking into consideration C.K.'s prior decompensation when not under treatment and discontinuing his medication, his dangerous behavior as a result of his serious mental disorder while not medicated, his lack of appreciation for the necessity of taking his medication, his stated intent to discontinue medication unless ordered by the court, and the very high probability that his behavior will once again become dangerous to himself and others if not under court order to take his medication. The record thus provides substantial evidence to support the trial court's finding that C.K. is gravely disabled using the clear, cogent, and convincing standard.

Accordingly, we hold that the trial court did not err in finding C.K. to be gravely disabled under chapter 71.05 RCW and in ordering a 180-day involuntary LRA treatment for C.K. Affirmed.

ARMSTRONG, C.J., and QUINN-BRINTNALL, J., concur.