# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of | No. 55517-4-II |
| R.F., | |
| Appellant. | UNPUBLISHED OPINION |

GLASGOW, A.C.J.—RF was involuntarily committed after his wife filed a Joel's Law[1]

petition due to his newly aggressive and erratic behavior. Doctors who treated RF petitioned for a

14-day commitment and then a 90-day commitment. At the 90-day commitment hearing, a

psychologist testified that RF presented symptoms of bipolar disorder but that RF did not believe

that he was mentally ill and would not take medication or seek mental health treatment if released.

The trial court found that RF was gravely disabled and granted the petition for involuntary

treatment but imposed a less restrictive alternative once the details of community placement could

be arranged.

RF argues that we should reverse the commitment order because substantial evidence does

not support the finding that he was gravely disabled. The State argues that we should dismiss RF's

appeal as moot because the commitment order has now expired.

We hold that the appeal is not moot and affirm.

---

[1] Joel's Law allows a person's immediate family member, guardian, conservator, or fellow Indian Tribe member to petition a superior court for detention of the person for involuntary treatment if a designated crisis responder has conducted an investigation within the last 10 days and decided not to detain the person. *See* RCW 71.05.201.

FACTS

A.    Initial Commitment

RF had a long history of manic and depressive cycles, although he had never been formally diagnosed with a mental health condition. His wife of 34 years, JF, was aware of the cycles and noticed that they were frequently triggered by stressful events. In July 2020, RF began to demonstrate signs of a manic episode, but JF found "nothing irregular or concerning about this episode." Clerk's Papers (CP) at 15. In September 2020, RF began to have problems passing urine and began to act oddly, including screaming expletives at doctors when JF brought him to the hospital.

RF was diagnosed with a urinary tract infection in October 2020. He did not take the antibiotics he was prescribed for at least two weeks. In that time, he lost a significant amount of weight and his uncharacteristically aggressive behavior continued to escalate. He threatened to "'burn the house down'" unless JF brought him their dog, and he yelled and spit at a friend for offering help if RF needed anything. CP at 7. He also began making large, unnecessary purchases that emptied his savings account and generated significant credit card debt. JF moved out of their house in late October 2020.

JF and a family friend requested a designated crisis responder investigation in early November 2020. During an interview with the crisis responder, RF "[d]isplayed several classic symptoms of mania," including "rapid pressured speech, grandiosity, agitation, possible religious pre-occupation and rather ambitious and somewhat chaotic plans." CP at 65. RF made statements "that he [was] a millionaire and he routinely feeds the homeless by giving them fish—as he is one of the best fisherm[e]n and . . . carpenters around '[j]ust like Jesus was.'" CP at 66. He did not

express any intent to harm himself or others, although he admitted to removing a colostomy bag himself and declined medical follow-up. The crisis responder did not detain RF, although they did encourage JF to file a Joel's Law petition to detain him under RCW 71.05.201.

The next day, JF filed a Joel's Law petition. Her petition included six declarations from neighbors, friends, and family members describing incidents beginning in October 2020 where RF had acted erratically or aggressively, in contrast to his usual "quiet," "polite" personality and "typically frugal" spending habits. CP at 52, 56. Several days later, the designated crisis responder issued a notice of emergency detention and RF was detained. He had no prior history of detention or mental health treatment.

On November 16, 2020, two doctors filed a petition for 14 days of involuntary treatment on the grounds that RF was gravely disabled.[2] The petition asserted that RF demonstrated a "disorganized thought process" and that his perception of reality was impaired, as demonstrated by his assertion that he was "'smarter'" than his diagnosis of bipolar disorder. CP at 84. The petition included statements from JF that the couple had a "'very fixed income'" and that RF's statements about his wealth were "'completely delusional.'" CP at 86. JF asserted that the urinary

---

[2] RCW 71.05.020(24) defines "gravely disabled:"

> "Gravely disabled" means a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and is not receiving such care as is essential for [their] health or safety.

At the time of RF's detention, the definition was codified at former RCW 71.05.020(21) (2020). Because the definition has not changed since RF's detention, we cite to the current version of the statute.

tract infection "'may have made the situation worse'" but stated that RF had been deteriorating since July 2020. *Id.*

After a hearing, a commissioner found that the urinary tract infection was likely not solely responsible for RF's conduct, as JF had identified a change in behavior in July 2020, and RF was still having symptoms after the infection resolved. The commissioner found that RF "would not be able to attend to his medical needs if he was released" and had previously been "threatening bodily harm to his family and neighbors." CP at 90. The commissioner found that RF was "gravely disabled" as defined in RCW 71.05.020(24)(b) and granted the petition.

B.      90-Day Commitment

Near the end of the 14-day commitment period, the doctors who had been treating RF petitioned for 90 additional days of involuntary treatment. The petition repeated JF's statements from the 14-day petition and asserted RF was manic and "talked about how 'rich' he was, saying he was a multi-millionaire and wanted to do nice things for people with his money." CP at 96. RF believed that all of his symptoms were related to his urinary tract infection and that he did not have an underlying mental health disorder. RF also told hospital staff that he was going to cure cancer, that he was the best mathematician in the world, that he was Jesus, and that he was going to buy an island in Alaska for hospital staff to live on. The petition stated that if released, RF "would be at risk to harm himself due to an inability to . . . care for [his] basic health and safety needs." CP at 97.

William Hansen, one of the petitioners, had evaluated RF twice since his initial detention, and for a third time on the morning of the 90-day commitment hearing, December 4, 2020. Hansen testified at the hearing that RF was demonstrating appropriate hygiene, was oriented to the date

4

and to proceedings in his life, and had an intact memory and coherent speech. RF had not tried to harm himself or others since his commitment. Hansen testified that RF had mood swings from "very manic" to "sad and crying" and had formally been diagnosed with "bipolar disorder, current episode manic, without psychotic features." CP at 145, 148. It "is not typical but it is not that unusual" for someone with bipolar disorder to have their first major episode in their late 60s. CP at 157. RF had demonstrated continuing paranoia, "believing that his wife [was] part of a conspiracy against him," that she "and her family [had] taken everything he has," and "that his wife suffers from an addiction to opioids and that is why she does this." CP at 146-47. RF demonstrated grandiose delusions that he was "the best fisherman in Puget Sound," and that he was going to win a multimillion dollar lawsuit "against SeaTac" and then buy property in Alaska. CP at 146. And he had "a severe flight of ideas," jumping rapidly between diverse conversation topics. CP at 149.

Although RF was cooperative with treatment while committed, Hansen testified that RF was not adequately cautious about edema in his legs despite nurses' orders, and he had made statements "that when he leaves [the hospital], he won't need medications and won't need any kind of treatment." CP at 147. Hansen testified that he believed RF "would be able to meet his needs" if released but was gravely disabled by his cognitive impairment from the paranoia and grandiose delusions. CP at 148. RF's cognitive issues had "improved a little" since he was committed, but were "still a major problem." CP at 150. Because he was resistant to taking medications or meeting with mental health professionals upon release, Hansen did not think RF was a good candidate for a less restrictive alternative to involuntary commitment at that time. And

JF, who had returned home since RF's hospitalization, expressed her intent to move out again "if he comes home before she figures he is stable." CP at 158.

RF testified that he had never been civilly committed or had any diagnosis of a mental health disorder before. He testified that he had supportive family in the community if he needed assistance, including his sister, nieces, and nephews. He had retirement and Social Security income, two forms of health insurance, and he owned his own home. He believed that he could independently manage the edema in his legs because he had experienced and resolved the condition before. He testified that he did not have a urologist, but went to the emergency room for his urinary tract infection because his body "told" him. CP at 164. He blamed his mental health symptoms on his infection, which had since subsided, and he felt that he was back to his "normal self." CP at 165. He understood that he had been "next to death" from the infection. CP at 166. He acknowledged that when the infection was active, he thought that he was "saying the right things" but "people [were] hearing different things." CP at 165. "I thought it was right but it was totally wrong, I'm sure." *Id.* He stated that he would be able to feed and care for himself if released and would seek treatment in the community if he had medical issues in the future. RF also testified that JF was trying to prevent her opioid addiction from being revealed by having him civilly committed.

The commissioner made findings of fact under a clear, cogent, and convincing evidence standard. The commissioner found that RF demonstrated "extreme" paranoia and had "poor insight into his mental health and medical health." CP at 102-03. The commissioner found that RF's cognition was impaired and "his grandiose delusions could lead to things outside his range of control." CP at 103. The commissioner emphasized RF's testimony that "his body told him" he had an infection, and "[h]e believed that he was saying the right things but people were hearing

different things out of his mouth." CP at 173. And the commissioner found that RF was "firmly against medications" and would not take medications or keep appointments with mental health professionals if discharged. *Id.*

The commissioner concluded that RF was "gravely disabled" as defined in RCW 71.05.020(24)(b), based on a finding of "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his . . . actions" and if released he would not receive "such care as is essential for his . . . health or safety." CP at 104. The commissioner granted the petition, but found that RF was eligible for less restrictive alternative treatment. The commissioner ordered involuntary treatment and continued detention, but directed the State to make arrangements for involuntary treatment in the community during the commitment period. On December 15, 2020, the court entered an order for involuntary treatment with the anticipated less restrictive alternative conditions, and he was released subject to those conditions.

RF filed a motion to revise the commissioner's December 4, 2020 order, which the trial court denied. RF appeals.

ANALYSIS

I. MOOTNESS

The State argues we should dismiss this case as moot because we cannot provide effective relief and there is no matter of continuing public interest warranting review. "An appeal is moot where it presents merely academic questions and where this court can no longer provide effective relief." *In re Det. of M.K.*, 168 Wn. App. 621, 625, 279 P.3d 897 (2012). But an individual's release will not render the appeal of their involuntary treatment moot if collateral consequences stem from

the determination that authorized the involuntary treatment. *See Born v. Thompson*, 154 Wn.2d 749, 762-63, 117 P.3d 1098 (2005).

When making a civil commitment determination, a trial court "shall give great weight" to the individual's prior civil commitments within the last three years. RCW 71.05.245(3). Thus, it has been well-settled for at least 20 years that "each commitment order has a collateral consequence in subsequent petitions and hearings." *M.K.*, 168 Wn. App. at 626; *see also In re Det. of C.K.*, 108 Wn. App. 65, 71-74, 77, 29 P.3d 69 (2001) (analyzing *In re Det. of LaBelle*, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986), and subsequent legislation to hold that C.K.'s prior history of decompensation was relevant to his latest involuntary commitment hearing). Thus, we can "render relief if we hold that the detention under a civil commitment order was not warranted." *M.K.*, 168 Wn. App. at 626. Because a trial court may consider prior commitment orders, constituting a collateral consequence, we address the evidence supporting the finding of grave disability even though the commitment order against RF has expired.

## II. SUBSTANTIAL EVIDENCE TO SUPPORT FINDING OF GRAVE DISABILITY

RF argues the trial court's conclusion that he was gravely disabled was not supported by substantial evidence. He believes that the evidence did not support a finding that he manifested severe deterioration in routine functioning because he "had the ability to gain access to medication, food, water, and housing upon release" and had cooperated with treatment. Br. of Appellant at 11. He argues that his marital issues and his wife's living situation were not relevant to the finding of grave disability and that Hansen had insufficient personal knowledge to testify that RF demonstrated paranoia. RF contests the findings regarding his anxiety and grandiose delusions and asserts they did not relate to the elements of grave disability. And he argues that invocation of his

right to refuse psychiatric treatment did not constitute evidence that he would fail to seek care essential for his health and safety upon release.

Because the trial court denied RF's motion for revision, the commissioner's findings and order became the order and findings of the trial court, therefore we review the commissioner's decision. *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). Our review is limited to determining whether substantial evidence supports the court's findings of fact and, if so, whether the findings support the conclusions of law. *Id.* Because the State bears the burden to prove its case by clear, cogent, and convincing evidence, we apply an elevated standard of review, and the "trial court's findings must be supported by evidence that makes the fact at issue highly probable." *In re Det. of P.R.*, 18 Wn. App. 2d 633, 645, 492 P.3d 236 (2021).

"[M]ental illness alone is not a constitutionally adequate basis for involuntary commitment." *LaBelle*, 107 Wn.2d at 201. But individuals may be involuntarily committed to undergo mental health treatment if they pose a likelihood of serious harm to themselves or others, or are "gravely disabled." RCW 71.05.150(1). The trial court made its gravely disabled finding under prong (b) of the "gravely disabled" definition in RCW 71.05.020(24) to support RF's involuntary commitment. To prove grave disability under prong (b), the State must show both severe deterioration in routine functioning from the repeated, escalating loss of cognitive or volitional control and that the detainee would not receive care essential for their health or safety if released. *LaBelle*, 107 Wn.2d at 205. When demonstrating evidence of "'severe deterioration in routine functioning,'" it is insufficient to show that treatment "would be preferred or beneficial or even in [the detainee's] best interests. To justify commitment, such care must be shown to be

*essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." *Id.* at 207-08.

This court recently held that substantial evidence supported a finding of grave disability under prong (b) where a detainee's delusional beliefs caused him to stop eating and to commit felony harassment of a stranger, and his symptoms persisted after his hospitalization. *In re Det. of A.M.*, 17 Wn. App. 2d 321, 335-36, 487 P.3d 531 (2021). And this court has held that the State need not prove a pattern of repeated hospitalization or intervention from law enforcement to establish that a person is gravely disabled under RCW 71.05.020(24)(b). *In re Det. of D.W.*, 6 Wn. App. 2d 751, 757-59, 431 P.3d 1035 (2018).

In *D.W.*, a 71-year-old man with no history of mental health issues presented "grandiosity, tangential speech, and flight of ideas," such as stating that he owned Western State Hospital, offering to buy another person a Mercedes, and claiming that he had a music contract with Chuck Berry's agent. *Id.* at 754. A psychiatrist interviewed DW and his treatment team and reviewed his records before testifying at his commitment hearing. *Id.* She testified that "many of [DW's] cognitive defects were caused by his alcohol abuse," which she expected DW to resume upon release. *Id.* at 754-55. She testified that DW believed that he did not have a mental illness and was unlikely to remain on medication if released. *Id.* at 754. And she testified that DW's bipolar disorder in conjunction with his likely alcohol abuse would render him unable to provide for his health and safety needs. *Id.* at 755. We held that substantial evidence supported the finding that DW was gravely disabled. *Id.* at 760.

This case is similar to *D.W.* Hansen evaluated RF several times and reviewed his records. Hansen testified, and the commissioner found, that RF was diagnosed with bipolar disorder;

presented paranoia, grandiose delusions, and flight of ideas; and he had poor insight into his mental and physical health. His cognitive symptoms had improved since his initial commitment but were "still a major problem." CP at 150. JF explained that RF's recent symptoms and behavior were completely out of character for him. The evidence presented made it highly probable that RF had experienced severe deterioration in routine functioning from the recent loss of cognitive or volitional control, satisfying the first element of the "gravely disabled" definition under RCW 71.05.020(24)(b). *LaBelle*, 107 Wn.2d at 205; *P.R.*, 18 Wn. App. 2d at 645.

In addition, the commissioner found that although RF cooperated with treatment when confined, had retirement income and health insurance, owned his own home, and testified that he would be able to feed and care for himself, RF told hospital staff that he would not take medication or seek mental health care upon release. RF's initial detention was precipitated by his refusal to take antibiotics for the infection and his self-removal of a colostomy bag, without medical follow-up. And Hansen testified that RF had ignored nurses' orders regarding the edema in his legs during his current hospitalization and did not intend to seek medication or treatment upon release, although RF testified that he believed he was capable of managing the edema because he had resolved the condition in the past. We conclude that this evidence established a high probability that RF's condition would deteriorate without involuntary treatment and that he would fail to receive care essential to his health or safety.

Overall, the commissioner appropriately imposed involuntary treatment but opted for a less restrictive alternative, allowing RF to live in the community once arrangements were made, but requiring involuntary treatment for the commitment period.

No. 55517-4-II

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, A.C.J.

We concur:

Worswick, J.

Price, J.