**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Detention of<br><br>M.M.,<br><br>             Appellant. | No. 84614-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — M.M. appeals the trial court's order involuntarily committing her for 14 days of treatment under the Involuntary Treatment Act (ITA), ch. 71.05 RCW. M.M. argues that the State presented insufficient evidence to support the trial court's conclusion that M.M. was gravely disabled under RCW 71.05.020(24)(a).[1] We affirm.

I.

On September 26, 2022, a designated crisis responder (DCR) responded to Forks Community Hospital after M.M. was admitted and was reporting "suicidal ideation" with a plan to "take her pills tonight." At the hospital, M.M. was seen responding to internal stimuli.

---

[1] On May 11, 2023, the legislature amended RCW 71.05.020. LAWS OF 2023, ch. 425, § 20. However, the amendments do not affect our analysis, so we will use the current version of the statute.

In her interview with the DCR, M.M. displayed "hopelessness," reported that "nobody loves" her, and that "things get messed up" when she is using methamphetamines. M.M. reported two recent failed attempts at suicide, including overdosing on her medications, and explained that she now knows how to "get the right combination" to succeed. M.M. also described voices in her head telling her they were going to "kill her." The DCR contacted M.M.'s sister who reported that M.M. was looking for a gun to kill herself. The sister stated that M.M. had been unable to do anything for months due to the "voices in her head." The sister also reported that M.M. was "super paranoid" and believed people were trying to kill her.

M.M. was detained under the ITA after the DCR referred M.M. for evaluation and treatment. M.M. was transported to Telecare North Sound Evaluation and Treatment Facility in Skagit County. While M.M. was detained, Telecare North Sound staff petitioned for a 14-day involuntary treatment, alleging that M.M. posed a likelihood of serious harm to herself.

The involuntary treatment hearing was held on October 4, 2022. Joann Clemo, a licensed social worker for Telecare North Sound, testified that M.M. had a mental health disorder with a diagnosis of psychosis unspecified. Clemo identified several symptoms observed in M.M. including internal preoccupation, responding to internal stimuli, and delusional thoughts. Clemo also testified that M.M.'s "delusional thought content and the internal preoccupation strongly suggest that she would not be able to care for her health and safety at this point." Clemo explained that while at Telecare North Sound, M.M. had called 911 claiming someone was trying to kill her, reported believing three specific women were trying to kill her, and repeatedly stated that she was seeing people

-2-

being murdered under the cars in the parking lot. These thoughts had been occurring up until two days before the hearing. Clemo also described an incident where M.M. tried to run out of the facility, she knocked down two people and staff had to intervene. Clemo also reported that M.M. had been "feeling suicidal due to her voices" the day before the hearing.

Clemo testified that M.M. had some substance use history, but she tested negative in the hospital. Clemo added that they did not see withdrawal symptoms at Telecare North Sound which "speak[s] to something other than substance use issues." Clemo testified that M.M.'s discharge plan of attending a specific substance use facility required more time for fine-tuning M.M.'s medication dosages. Clemo concluded that M.M. "has made some progress, but she would not be able to manage her health and safety due to her thought contact right now."

The court found that M.M. suffered from a mental disorder and was gravely disabled. The court ordered that M.M. be committed for 14 days for involuntary treatment.

M.M. appeals.

II.

The State argues that we should dismiss this case as moot because we cannot provide effective relief and that there is no matter of continuing public interest warranting review. "An appeal is moot where it presents merely academic questions and where this court can no longer provide effective relief." In re Det. of M.K., 168 Wn. App. 621, 625, 279 P.3d 897 (2012). But an individual's release will not render the appeal of their involuntary treatment moot if collateral consequences stem from the

determination that authorized the involuntary treatment. See Born v. Thompson, 154 Wn.2d 749, 762-63, 117 P.3d 1098 (2005).

When making a civil commitment determination, the court "shall give great weight" to the individual's prior civil commitments within the last three years. RCW 71.05.245(3). Thus, "each commitment order has a collateral consequence in subsequent petitions and hearings." M.K., 168 Wn. App. at 626; see also In re Det. of C.K., 108 Wn. App. 65, 71-74, 29 P.3d 69 (2001) (analyzing In re Det. of LaBelle, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986), and subsequent legislation to hold that C.K.'s history of decompensation was relevant to his latest involuntary commitment hearing). Thus, we can "render relief if we hold that the detention under a civil commitment order was not warranted." M.K., 168 Wn. App. at 626. Because a court may consider prior commitment orders, we address M.M.'s appeal even though the commitment order has expired.

III.

M.M. argues that the State failed to present sufficient evidence to establish that M.M. was gravely disabled under the definition in RCW 71.05.020(24)(a). We disagree.

The ITA authorizes courts to commit an individual for up to 14 days if, by a preponderance of the evidence, the petitioning party proves that such person, "as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(4)(a). The State's authority to commit people under the ITA is "strictly limited." In re Det. of D.W., 181 Wn.2d 201, 207, 332 P.3d 423 (2014). The court must consider less restrictive alternatives, but if it finds that none are sufficient, the ITA dictates that the court must order the individual be detained to a licensed treatment

facility. RCW 71.05.240(4)(a). Involuntary commitment is a "massive curtailment of liberty," thus, courts must strictly construe the statutes regulating these proceedings. Humphrey v. Cady, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); D.W., 181 Wn.2d at 207.

On review, we determine whether substantial evidence supports the trial court's findings and, if so, whether those findings support its conclusions of law and judgment. In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998), aff'd, 138 Wn.2d 898, 982 P.2d 1156 (1999). "Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise." Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980).

RCW 71.05.020(24) defines "gravely disabled" as:

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

The court here issued the civil commitment order under prong (a) of the gravely disabled definition.[2] Prong (a) requires "a showing of a substantial risk of danger of serious physical harm resulting from failure to provide for essential health and safety needs." LaBelle, 107 Wn.2d at 204. But the substantial risk of harm need not "be evidenced by recent, overt acts." LaBelle, 107 Wn.2d at 204. Rather, "the State must present recent, tangible evidence of failure or inability to provide for such essential

---

[2] While the petition checked the box indicating M.M. presents a likelihood of serious harm to herself not the box for grave disability, M.M. has not assigned error to this and in a footnote concedes that the factual contentions in the petition were sufficient to provide notice: "Finally, unlike in the case of the 'a' criterion, the 14-day petition itself contained no related allegations."

human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." LaBelle, 107 Wn.2d at 204-05. The State must show that the person's mental condition "render[s] [her] unable to make a rational choice with respect to [her] ability to care for [her] essential needs." LaBelle, 107 Wn.2d at 210.

According to the court's written order:

[M.M.] is improving but unable to engage in treatment. Diagnosis is psychosis unspecified. Responds to internal stimuli and shows delusional thought content. Has been tangential & labile. Has expressed suicidal ideation. ADLs[3] are fairly good and is taking meds but needs further stabilization [for] discharge. [M.M.] has responded to internal stimuli and delusional thoughts as recently as yesterday.

There was sufficient evidence to support the trial court's finding that M.M. was in danger of serious physical harm resulting from failure to provide for her essential needs. RCW 71.05.020(24)(a). Clemo testified that M.M.'s current diagnosis was psychosis unspecified and described M.M. as internally preoccupied, responding to things unseen and unheard by others, and having delusional thought content. M.M. was "tangential and nonsensical with most of her responses and very labile."

M.M. asserts that neither the court, nor Clemo, explained how M.M.'s psychotic symptoms prevented her from meeting essential health or safety needs. Proving an individual is gravely disabled under prong (a) does not necessarily require prior knowledge of the individual's lifestyle, but instead recent tangible evidence of failure to provide for essential human needs. LaBelle, 107 Wn.2d at 204-05. The risk of harm "usually arises from passive behavior." LaBelle, 107 Wn.2d at 204. Here, the State

---

[3] Activities of daily living.

properly focused on the recent evidence that during M.M.'s commitment, many mental health symptoms persisted despite her general compliance with some aspects of treatment.

The court's findings are supported by substantial evidence that while at Telecare North Sound, M.M. continued to experience delusional thought content and internal preoccupation. From the facility, M.M. called 911 claiming someone was trying to kill her and repeatedly told providers she was seeing people being murdered under their cars in the parking lot. M.M. was initially detained because of an imminent risk of suicide and while she was no longer expressing plans, the day before the hearing she was feeling suicidal and hearing voices.

Clemo admitted that M.M.'s activities of daily living had been improving while at Telecare North Sound. But M.M. showed impaired insight into her prescribed medications. M.M. did not understand what medications she was taking, was maxing out her use of "as needed" medications, and did not understand that her prior medications did not seem to work which is why Telecare North Sound was trying to switch and modify them. Even during the hearing, M.M. interrupted the proceedings twice showing that she did not understand the medications that were being given.[4]

Clemo also testified that M.M. was unable to engage and continue in conversations with her. This prevented M.M. from engaging in discharge planning to take care of her essential needs. And while M.M. told Clemo that she wanted to be discharged to a specific chemical dependency program, the program was unlikely to

---

[4] Clemo testified that Telecare North Sound had just started M.M. on Depakote and was giving her Zyprexa. M.M. interrupted to say she had never had Zyprexa. A few minutes later, she interrupted again and said that she had never taken Depakote before.

take someone until they were showing no psychotic symptoms and were stable on medication. These facts all show a failure and inability to provide for her ongoing medical treatment.

Reviewing the record as a whole, the trial court's findings for M.M.'s 14-day involuntary commitment are supported by substantial evidence.

Affirmed.

_Mann, J._

WE CONCUR:

_Smith, C.J._     _Dwyer, J._