IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>K.D. | No. 87551-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — K.D. contends a commissioner of the superior court erred when it revoked his 90-day less restrictive alternative (LRA) treatment order and imposed 14 days of involuntary inpatient treatment.  Finding no error, we affirm.

## I.    BACKGROUND

In mid-October 2024, Fairfax Hospital successfully petitioned to detain K.D. for 14 days of involuntary treatment.  Toward the end of that period, he stipulated that he was "gravely disabled," as defined by "prong B" of RCW 71.05.020(25)(b), and agreed to undergo 90 days of LRA treatment, which the court found and ordered respectively ("LRA order").

The LRA order, entered on October 29, required K.D. to take all prescribed medications and "[r]efrain from acts, attempts, and threats of harm to self, others, and others' property."   The order also stated—consistent with RCW 71.05.590— that, if a Designated Crisis Responder (DCR) determined K.D. was not abiding by

the order's terms, he could be detained at an evaluation and treatment facility. A hearing would then be held within 5 days to decide whether the order should be modified, or he should be committed to 14 additional days of inpatient treatment.

Approximately 10 days later, K.D.'s mother brought him to Connections Kirkland because she was concerned that he was decompensating from his baseline. She reported that he was not taking his medications because he believed he did not need them. According to a doctor at the facility, K.D. presented with an unstable mood, grandiose and paranoid beliefs, and lacked insight into his mental health. K.D. then attempted to leave the facility, which prompted staff to contact law enforcement. When officers arrived, K.D. reportedly asked them to either shoot him or allow him to harm himself and then threatened they would not see their families again if they continued to direct him back inside.

Ultimately, K.D. was detained at Connections Kirkland and, three days later, a DCR petitioned the court to revoke his LRA order. The petition alleged that he met the conditions justifying revocation under RCW 71.05.590 based on his interaction with law enforcement and his subsequent behavior. The DCR further opined that less restrictive alternatives were not available because K.D. opposed voluntary hospitalization, was refusing to take medications, and remained in a decompensated state. Thus, the petition averred that K.D. required psychiatric hospitalization for safety and stabilization.

On November 19, a commissioner held a hearing on the motion to revoke his LRA order and heard sworn testimony from three witnesses; namely, one of the Kirkland Police officers who had interacted with K.D. when he tried to leave

Kirkland Connections, K.D.'s mother with whom he had been living, and a court evaluator and licensed clinical social worker who provided expert testimony.

The commissioner found that the State had proven by clear, cogent, and convincing evidence that revocation of the LRA order and additional inpatient treatment was proper under several of RCW 71.05.590's conditions. Thus, it remanded K.D. to Crisis Connections, revoking his prior LRA order and committing him to inpatient treatment for 14 days.

K.D. has appealed from that November 2024 commitment order.

## II.    ANALYSIS

### A.    Order of Revocation and Commitment

K.D. raises several related assignments of error, which effectively assert that the court erred, first, by revoking his LRA order and, second, by committing him to 14 days of inpatient treatment. We address each in turn.[1]

#### 1. Revocation

First, K.D. claims that the court violated his due process rights when it revoked the LRA order because it made "no express finding of grave disability" and, separately, that the State presented insufficient evidence that he was gravely disabled at the time of the revocation under the governing statute. We address each in turn.

---

[1] As a preliminary matter, K.D. argues, and the State does not dispute, that his appeal is not moot even though he has long since completed the 14-day commitment ordered by the court. We agree. See In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012).

3

### a. Constitutional Requirement to Make a Grave Disability Finding

It is true that due process prohibits the State from confining a person for mental health treatment unless it proves, and the trial court finds, that the individual is either dangerous or unable to "live safely in freedom." O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S. Ct. 2486 (1975). This protection exists regardless of whether it is codified by statute. Id. at 573-74. Chapter 71.05 RCW addresses this due process requirement by requiring that a court find that the individual at risk of commitment poses "a likelihood of serious harm" or is "gravely disabled." RCW 71.05.240(4)(a).

As relevant here, under the second of two definitions set out by RCW 71.05.020(25)(b), a.k.a., "prong (b)," a person is gravely disabled when: "as a result of a behavioral health disorder . . . [that person] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."

When the State petitions to involuntarily detain someone for 14 days pursuant to RCW 71.05.240 and the respondent contests treatment, the State must prove their case at a hearing by a preponderance of the evidence. RCW 71.05.240(4)(a). Alternatively, however, a court may "rely on a *stipulation* that the person subject to the order is gravely disabled or presents a likelihood of serious harm to self or others." In re Det. of B.H., 18 Wn. App. 2d 46, 49-50, 488 P.3d 887 (2021) (emphasis added).

In B.H., we held a respondent's due process rights were violated when she

4

was committed after her LRA order was revoked because the court never made findings as to grave disability "at any point in the proceedings" nor was it stipulated to. Id. We explained the case could not constitutionally warrant involuntary commitment without either a judicial finding of grave disability, at some point in her proceedings, or an express stipulation "at the time of imposition of the LRA." Id.

Here, by contrast, K.D. *did* stipulate to grave disability when his LRA order was imposed. ("Respondent stipulates that there are facts sufficient in the initial petition to establish. . .[he] is gravely disabled under [']prong B.[']") And as a matter of constitutional law, our holding in B.H. did not stand for the proposition that a court must make a renewed finding of grave disability, even when a respondent had stipulated to it, particularly so recently. K.D. received notice and was given an opportunity to be heard, both at the time of the stipulated LRA order and at the hearing on the revocation. The court, after such process, found that K.D. was gravely disabled and had experienced a substantial deterioration in functioning respectively. Cf. O'Connor, 422 U.S. at 573 (where a jury found "Donaldson was neither dangerous to himself nor dangerous to others, and also found that, if mentally ill, Donaldson had not received treatment"). Thus, we hold that the court did not violate K.D.'s due process rights when it committed him without making a separate grave disability finding during his revocation proceeding.

Further, K.D. has not provided any binding authority for his contention that the court was required to make such a finding of grave disability when it revoked his LRA in order to satisfy due process. See DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in

support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). On this record, on these facts, we will create no such obligation.

2. Evidence To Support Revocation

K.D. also claims the court erred because it revoked his LRA order without statutorily sufficient evidence and because it made inconsistent findings which must all be "discarded." We disagree.

The statute setting the parameters for revocation hearings states there are four "issues for the court to determine"—whether:

> (i) The person adhered to the terms and conditions of the order; (ii) substantial deterioration in the person's functioning has occurred; (iii) there is evidence of substantial decompensation with a reasonable probability that the decompensation can be reversed by further inpatient treatment; or (iv) there is a likelihood of serious harm.

RCW 71.05.590(5)(d). Then, "if any of th[ese] conditions apply," the court must determine "whether it is appropriate for the court to reinstate or modify the person's [LRA] treatment order . . . or order the person's detention for inpatient treatment." Id.

We have held this plain statutory language indicates revocation is "conditioned *only* on the determination that *one* of four events has occurred: the respondent has failed to adhere to the LRO, the respondent's functioning has substantially deteriorated, the respondent has experienced a substantial decompensation that could be reversed by further treatment, or the respondent poses a likelihood of serious harm." In re Det. of B.M., 17 Wn. App. 2d 914, 920-21, 492 P.3d 837 (2021) (emphasis added).

The State acknowledges that, according to rules governing superior court mental proceedings, the court must find that a person did not adhere to an LRA order's terms by clear, cogent, and convincing evidence. Br. of Resp't at 14 (quoting 4A Elizabeth A. Turner, Washington Practice: Rules Practice CCR 4.5, at 210 (Supp. 2025). On that standard, we will not disturb a trial court's findings if they are supported by substantial evidence from which the court could reasonably have found them to be "highly probable." In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

Here, we hold that there was substantial evidence to support that the conditions set out in RCW 71.05.590(5)(d)(i) and RCW 71.05.590(5)(d)(ii) were met in order to justify the revocation.

As to RCW 71.05.590(5)(d)(i), there was substantial evidence that K.D. had not adhered to the terms of the LRA order to take prescribed medications and to refrain from threats of harm to himself or others. His mother testified that he stopped taking his medications and was sometimes aggressive in a way that made her and K.D.'s father concerned for their safety. Moreover, one of the responding police officers testified that K.D. had asked officers to tase him and shoot him. He then asked them to give him a gun so he could shoot himself. This was substantial evidence that he had not refrained from threats of harm to self. The officer testified that he felt fear after K.D. said something like "Do you love your family? If you want to see your family again, don't do what you're about to do." Indeed, the court evaluator also testified that, according to notes from a psychological evaluation, K.D. had admitted making verbal threats toward the officers during that encounter.

7

Together, this testimony provided substantial evidence from which the court could reasonably conclude it was highly probable he violated the plain terms of the condition of his LRA to refrain from threats of harm to others.

As to RCW 71.05.590(5)(d)(ii), the court evaluator opined that K.D. had demonstrated a substantial deterioration of his functioning. She explained that he had endorsed beliefs reflecting an irrational and illogical thought process and unstable moods which hindered his ability to take care of himself in the community. His mother also testified that after he stopped taking his medications, he became manic and experienced mood swings. This was substantial evidence from which the court could reasonably conclude it was highly probable he had experienced a substantial deterioration in functioning.

In response, K.D. makes several unavailing contentions, which are not supported by citations to binding Washington authority. For instance, he argues any inconsistent findings must be disregarded based on an untenable inference he makes from a single, non-binding federal case and a citation to a distinct point in Washington law. Yet he later concedes "the fact that some findings are inconsistent does not always invalidate the judgment when other unchallenged findings are sufficient to support it." That is the situation here.[2]

---

[2] He also appears to make conclusory assertions, which infer findings the court did not actually make, in order to create some of the inconsistency he alleges. And he briefly asserts the LRA order unconstitutionally regulated his pure speech—an argument he neither included in his assignments of error nor substantively develops further. Clark County v. W. Wash. Growth Mgmt. Hr'gs Review Bd., 177 Wn.2d 136, 144, 298 P.3d 704 (2013) (noting the scope of a given appeal is determined in part by the appellant's assignments of error); Kauzlarich v. Yarbrough, 105 Wn. App. 632, 653, 20 P.3d 946, 956 (2001) (noting that appellant

Ultimately, even if the court made arguably inconsistent findings, RCW 71.05.590(5)(d) sets out four possible bases which justify a decision to revoke an LRA order, and K.D. has not shown the record lacks substantial evidence for the two conditions it found were met.

Moreover, K.D. cites no authority for his proposition that "empty words are not threats." His remaining related arguments are also unconvincing as they rely on definitions of threats that apply in different contexts or cite to distinct subject matter from out of state or federal law, including cases which address findings from criminal bench trials.

3. Evidence to Support the Subsequent 14-day Order of Commitment

Finally, K.D. claims the court erred because it did not consider whether to modify his LRA order before imposing inpatient treatment and there was insufficient evidence to support that commitment was "appropriate."

RCW 71.05.590(3)(b) dictates that a person under an order for less restrictive alternative treatment can only be remanded into inpatient treatment as provided under subsection RCW 71.05.590(5)(d). That section specifies that if a court determines any of four conditions are met, it must then determine "whether it is appropriate" to reinstate or modify the LRA order or order inpatient treatment. Indeed, K.D. concedes that "[t]he statute governing revocation proceedings does not provide a standard for when the person should be committed, other than that it should be done when 'appropriate.'"

did not make "a fully reasoned argument" and holding, "[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

K.D. asserts, and the State does not contest the rule, that the court must find by clear, cogent, and convincing evidence that the terms should not be modified, and a person should be returned to inpatient treatment. Again, under that burden of proof, we will not disturb the court's findings "if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." LaBelle, 107 Wn.2d at 209.

Here, the commissioner determined that returning K.D. to an LRA order was not appropriate or in his best interests because he was "not sufficiently stabilized on medication and has demonstrated an inability to follow the requirements of his less restrictive order"—noting he "continues to deny the need for medication." The commissioner relied on the testimony of K.D.'s mother who, when asked if she would be concerned if her son were to come back to stay at home, stated, "Unfortunately, at this point, yes. I don't see enough stability in his moods to feel 100 percent comfortable." The commissioner also relied on the testimony from multiple witnesses that K.D. was denying the need for any medication. Id.

In claiming that the court erred, K.D. does not cite to any authority requiring courts to explicitly rule out all possible modifications or otherwise use specific magic words before ordering commitment at revocation hearings. In fact, we held to the contrary in B.M., holding that "the statute at issue here does not mandate that the court make explicit factual findings regarding a respondent's symptoms or behavior." 17 Wn. App. 2d at 924.[3] We explained, "[w]e will not import

---

[3] K.D. also cites to In re Det. of C.K., 108 Wn. App. 65, 29 P.3d 69 (2001) in support of his claim that more is required. But that case is inapposite as it did not involve

requirements into the ITA when the plain language of the statute demonstrates no legislative intent to impose such requirements." Id. at 920. Moreover, our holding in that case supports that the court did not err here. Id. at 924. There, we concluded the court properly found (1) the respondent had violated the terms of her prior order with regard to taking drugs, and (2) it was inappropriate to reinstate a LRA because the respondent "had not yet stabilized," just as the court reasoned here. Id.

In arguing that the court's ruling was insufficiently specific and not supported, K.D. asserts "inpatient treatment was not in [his] best interests because he could have managed his symptoms by adjusting his medication under a modified version of the less restrictive order." However, the question before us is not whether K.D. could possibly have managed his symptoms if the court had modified his LRA, but rather, whether the court had sufficient evidence to conclude it was appropriate or in his best interest to impose inpatient treatment, and there was substantial evidence that inpatient treatment was in his best interests—as already outlined, including the fact that he continued to deny a need to take any medication.

In his reply brief, K.D. again contends the court did not "*adequately* consider whether a remedy short or revoking . . . and detaining" him sufficed in lieu of commitment. But there is simply no statutory or common law requirement that a court must make any particular, or more specific, statement in conveying its ruling.

---

a petition to revoke. In fact, this court there merely affirmed a 180-day LRA order and did not consider, let alone impose, a "modified" order, as his briefing suggests.

In short, K.D. has not shown the court made inadequate findings or that it lacked substantial evidence to find that it was appropriate to commit him to inpatient treatment.

### III.  CONCLUSION

We affirm.

WE CONCUR:                          Díaz, J.

Bui, J.              Chung, J.