IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Detention of D.O. | No. 86099-2-I |
| | DIVISION ONE |
| | UNPUBLISHED OPINION |

DÍAZ, J. — Following a jury trial, the court committed D.O. to 90 days of involuntary inpatient treatment. D.O. now challenges the constitutionality of a provision in the "Involuntarily Treatment Act" (ITA), chapter 71.05 RCW, which requires a jury to give "great weight" to evidence of a "prior history or pattern of . . . hospitalizations" in "determining whether an inpatient or less restrictive alternative commitment . . . is appropriate." RCW 71.05.285. D.O. also assigns error to how the court handled evidence about his guardianship, arguing that it improperly modified an instruction he proposed and that it admitted unfairly prejudicial testimony from his guardian. We affirm.

I.     FACTS

In October 2023, an ambulance brought D.O. to Providence Regional Medical Center after a hostile interaction with local police. A designated crisis responder evaluated him and then transported him to Mukilteo Evaluation &

Treatment (ME&T), which then filed a 14-day involuntary commitment petition. The court granted ME&T's 14-day petition. Afterward, his ME&T examining physician, Dr. Kathryn Gilligan, petitioned to have him committed for 90 additional days on the basis that he was gravely disabled. He opposed the petition, demanding his right to a jury trial.

At trial, Dr. Gilligan testified that D.O. suffers from a behavioral health disorder, arising in part from a traumatic brain injury D.O. suffered in a car accident when he was around 18 years old and in part from schizophrenia.

The State presented evidence about D.O.'s "baseline" condition and his inability to keep himself safe in the community at the time of the trial. Dr. Gilligan testified that she had reviewed the providers' notes about D.O.'s previous hospitalizations, finding that his current symptoms were similar to those during the prior hospitalizations. Further she opined that D.O. had left several prior hospitalizations in a better mental condition than he was currently exhibiting and that, thus, he had not reached his "baseline," which she defined as "how well people are doing . . . when they're doing their best." In addition, ME&T evaluator Doreen Yumang-Ross testified that D.O. was not yet at his baseline, and that he was at risk of harm because he was unable to attend to his health and safety needs.

The State also presented evidence about D.O.'s worsening condition in the period prior to his detention, his behavior in the community, and his ability to perform outside the structured environment of the ME&T facility. Among others (e.g., Sergeant Karl Gilje), D.O.'s guardian, Elizabeth Gilpin, testified that he had

2

experienced a recent deterioration in his living conditions. She told the jury about an incident several months before the trial in which he appeared unkempt, threatened to rip up money she tried to give him, and was so agitated that she feared for her safety.

Finally, the jury also heard evaluator Yumang-Ross testify that she believed no less restrictive alternative in the community was in D.O.'s best interest.

The jury found that D.O. had a behavioral health disorder that rendered him gravely disabled and that an environment less restrictive than secure detention was not in his best interest. The court issued findings of fact and conclusions of law consistent with the jury's verdict and committed D.O. to 90 days of additional in-patient treatment. D.O. timely appeals the court's order of commitment.

## II.     ANALYSIS

### A.     The Constitutionality of RCW 71.05.285

#### 1.     Law

##### a.     Background on Grave Disability and RCW 71.05.285

The ITA provides for several ways that a person with a behavioral health disorder may be involuntarily committed. In re Det. of P.P., 6 Wn. App. 2d 560, 568, 431 P.3d 550 (2018). A mental health professional may petition for an initial 72-hour detention and then 14 days of involuntary commitment. Id. at 568-69. When that period expires, they may seek an additional 90-days of involuntary commitment if the person is inter alia "gravely disabled." RCW 71.05.280(4), RCW 71.05.320(1)(a). The rules of evidence apply to these proceedings and the State must prove its case by clear, cogent and convincing evidence. RCW 71.05.310.

3

Under the ITA, a person is "gravely disabled," among other times, when they (i) manifest severe deterioration in routine functioning, as shown by escalating loss of control over thoughts and actions, and (ii) are not receiving essential care in the community. In re LaBelle, 107 Wn.2d 196, 205, 728 P.2d 138 (1986) (citing RCW 71.05.020(25)(a)(b), a.k.a., "prong (b)").

As to the latter element, the State's evidence "must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." Id. at 208. Because the State must prove such "care" is not only beneficial, but essential to a person's health or safety, its evidence "should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." Id.

Stated otherwise, if a jury finds that a person is gravely disabled, it must then decide whether the person should be detained during treatment or released subject to conditions in as a "less restrictive" environment. RCW 71.05.320. In this way, the legislature intended both to "enhance continuity of care" for people with disorders "that can be controlled or stabilized in a less restrictive alternative commitment" and to "encourage appropriate interventions at a point when there is the best opportunity to restore . . . or maintain satisfactory functioning." RCW 71.05.012.

The legislature further found that, "[f]or persons with a prior history or pattern of repeated hospitalizations . . . due to decompensation, the consideration of prior history is particularly relevant in determining whether the person would receive, if released, such care as is essential for his or her health or safety." Id.

4

Thus, the legislature explained, "a prior history of decompensation leading to repeated hospitalizations . . . should be given great weight *in determining whether a new less restrictive alternative commitment should be ordered*." Id. (emphasis added).

The legislature codified these findings in RCW 71.05.285, stating:

*In determining whether an inpatient or less restrictive alternative commitment* under the process provided in RCW 71.05.280 and 71.05.320(4) *is appropriate*, great weight *shall* be given to evidence of a prior history or pattern of decompensation and discontinuation of treatment resulting in . . . Repeated hospitalizations . . . Such evidence *may* be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety.

(Emphasis added); In re Det. of C.K., 108 Wn. App. 65, 73 n. 8, 29 P.3d 69 (2001).

b.      Substantive Due Process and Constitutional Challenges

The protections of substantive due process under the Fourteenth Amendment to the United States Constitution bar "wrongful and arbitrary government conduct, notwithstanding the fairness of the implementing procedures." State v. Beaver, 184 Wn.2d 321, 332, 358 P.3d 385 (2015).

Civil commitment deprives a person of liberty, so it must meet the demands of substantive due process. State v. McCuistion, 174 Wn.2d 369, 387, 275 P.3d 1092 (2012); Beaver, 184 Wn.2d at 331 ("Freedom from bodily restraint is at the core of the liberty interest protected by the due process clause.") And when government action interferes with a fundamental right, such as liberty, substantive due process requires the application of strict scrutiny to that action. Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 219, 143 P.3d 571 (2006), overruled on other grounds by Yim v. City of Seattle, 194 Wn.2d 682, 451 P.3d 694 (2019).

5

Infringement on a fundamental right is constitutionally authorized only when it is narrowly drawn to serve a compelling state interest. Id. at 220.

"[C]ivil commitment statutes are constitutional only when both initial and continued confinement are predicated on the individual's mental abnormality and dangerousness." McCuistion, 174 Wn.2d at 387. In other words, civil commitment must be based on findings of both mental illness and dangerousness in order to meet the requirements of substantive due process. In re Det. of M.W., 185 Wn.2d 633, 649, 374 P.3d 1123 (2016). This requirement stems from the United States Supreme Court's holding that substantive due process "requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." Foucha v. Louisiana, 504 U.S. 71, 79, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992).

We review a statute's constitutionality de novo. State v. Batson, 196 Wn.2d 670, 674, 478 P.3d 75 (2020). A successful facial constitutional challenge to a statute is one where "no set of circumstances exists in which the statute, as currently written, can be constitutionally applied." City of Redmond v. Moore, 151 Wn.2d 664, 669, 91 P.3d 875 (2004). "An as-applied challenge to the constitutional validity of a statute is characterized by a party's allegation that application of the statute in the specific context of the party's actions or intended actions is unconstitutional." Id. at 668-69. Wherever possible, it is our duty to construe a statute to uphold its constitutionality. Batson, 196 Wn.2d at 674.

2. Discussion

D.O. asserts that RCW 71.05.285 violates the requirements of substantive due process by requiring the factfinder to give "great weight" to a person's past

6

hospitalizations. More specifically, he argues that giving such facts great weight "functionally undercuts" the State's burden to prove their case by clear and convincing evidence and "functions similarly to a mandatory presumption," which is nearly impossible to rebut. He avers that RCW 71.05.285 "prioritizes the State's evidence to such a degree that it functionally erases the evidentiary requirement for involuntary commitment." He contends, "[w]hile the language of RCW 71.05.285 does not mandate any findings, its practical effect is the same." He argues the use of "shall" is overly broad because "may"—his proposed, alternative wording—is more narrowly tailored yet would equally or better serve that interest.[1]

As a preliminary matter, D.O. made clear at oral argument that he brings only a facial constitutional challenge to RCW 71.05.285, although the court incorporated a portion of the statute into a jury instruction.[2] Wash. Ct. of Appeals oral argument, In re the Detention of D.O., No. 86099-2-I (Jan. 16, 2025), at 2 min., 5 sec. through 2 min., 15 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025011439/?eventID=2025011439. That is, he confirmed he does not advance a separate challenge to how the instruction itself was provided in his case. Id. at

---

[1] We reject the State's first argument that D.O.'s appeal is moot because the 90-day order has expired and he has since been readmitted. Prior involuntary treatment orders may affect subsequent civil commitment determinations; thus, this court may still render effective relief even if an appellant has been released or even recommitted since the time of an appealed order. In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012). That is, were we to conclude that the detention was not warranted, that conclusion could affect a future civil commitment petition. The appeal is not moot.

[2] The instruction omitted RCW 71.05.285's opening clause, which reads "In determining whether an inpatient or less restrictive alternative commitment . . . is appropriate," but it is otherwise identical to the statute.

7

1 min., 51 sec. through 1 min., 54 sec. He challenges the "application" of RCW 71.05.285 only in the sense that the court relied on and recited a portion of the statute in the jury instruction, not in an "as applied" constitutional sense. Id. at 1 min., 55 sec. through 1 min., 59 sec. And he does not otherwise assign error to *how* the language of the statute was excerpted into the instruction. Id.

Even accepting the State's concession that we must apply strict scrutiny to this challenge, we reject D.O.'s argument that RCW 71.05.285 is unconstitutional because (1) it does not weaken the State's burden of proof to show his confinement was "predicated" on, or reasonably related to, his "mental abnormality and dangerousness," McCuistion, 174 Wn.2d at 387, Foucha, 504 U.S. at 79; and (2) it is narrowly tailored to serve compelling state interests, Amunrud, 158 Wn.2d at 220.

RCW 71.05.285 does not reduce the State's burden of proof because its plain language does not impose, nor does it effectively function like, a mandatory presumption that a jury find a person gravely disabled. D.O. conceded at oral argument that the statutory language is not a literal mandate, given that its final sentence states that evidence of prior hospitalizations "*may* be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety." RCW 71.05.285 (emphasis added). Wash. Ct. of Appeals oral argument, supra at 3 min., 4 sec. through 3 min., 8 sec.

We have long held that the term "may" is "presumed to be used in a permissive or discretionary sense." Granite Beach Holdings, L.L.C. v. Dep't of

8

Natural Res., 103 Wn. App. 186, 206-07, 11 P.3d 847 (2000). In fact, even the term "shall" may be used as "directory rather than mandatory depending upon legislative intent." Wash. State Liquor Control Bd. v. Wash. State Pers. Bd., 88 Wn.2d 368, 378, 561 P.2d 195 (1977) (quoting Spokane v. Spokane Police Guild, 87 Wn.2d 457, 465, 553 P.2d 1316 (1976)). And that term's meaning "is not gleaned from [use of] that word alone because our purpose is to ascertain legislative intent of the statute as a whole." State v. Rice, 174 Wn.2d 884, 896, 279 P.3d 849 (2012) (alterations in original) (quoting State v. Krall, 125 Wn.2d 146, 148, 881 P.2d 1040 (1994)). It is clear to us that, after reading the two sentences of RCW 71.05.285 together, RCW 71.05.285 directs a fact-finder to consider evidence of prior hospitalizations heavily, but does not thereby require that the fact-finder order involuntary commitment on that basis.

Moreover, when reading RCW 71.05.285 as a whole—and in particular its opening clause—it is also clear to us that the statute contemplates that the fact-finder's decision to order involuntary commitment has already been made, and that the only remaining question is what *type* of treatment a person should receive: whether an inpatient or less restrictive alternative commitment. The State must first have convinced the fact-finder that his confinement is predicated on his "mental abnormality and dangerousness" as gravely disabled. McCuistion, 174 Wn.2d at 387. The statutory elements and burden of proof of the ITA remain unchanged.[3]

---

[3] At oral argument, D.O. appeared to contend that the State's closing argument improperly urged the jury to use RCW 71.05.285 as a shortcut to find him gravely disabled. Wash. Ct. of Appeals oral argument, supra at 20 min., 3 sec. through 20

9

Finally, RCW 71.05.285 does not violate substantive due process for failing to be narrowly tailored to serve a compelling state interest.

Our Supreme Court's decision in M.W. is instructive here. 185 Wn.2d at 633. There, the Court considered consolidated cases of individuals originally charged with a violent felony and deemed incompetent to stand trial. Id. at 645. After being involuntarily committed for 180 days, the State petitioned for an additional 180 days, and both appellants were further detained. Id. at 646. The trial court then held that a former statutory provision of the ITA—one that modified the procedure for recommitting people to an additional 180-days of involuntary treatment—was unconstitutional on multiple grounds, including substantive due process. Id.

The Court reversed, holding first that the State has a compelling interest in protecting the community from mentally ill persons who pose a danger to themselves and others and in providing care to those who are unable to care for themselves. Id. at 641, 649-53. That interest remains the same here, where, as stated in RCW 71.05.012, "the consideration of prior history is particularly relevant in determining whether the person would receive, if released, such care as is essential for his or her health or safety."

The Court also rejected the argument that the provision of the ITA was not narrowly tailored to serve the act's purpose because "it ma[d]e the process easier

---

min., 12 sec. It did not. It argued that "you [the jury] are to give great weight to evidence of prior hospitalizations or repeated prior hospitalizations," and stated "this evidence may be a factual basis for concluding that, if released, he would not receive care that is needed for his health and safety."

for the State to recommit certain mentally ill people, possibly indefinitely." M.W., 185 Wn.2d at 651. The Court held that the provision was appropriately tailored even though it "alter[ed] the process for when and how to present evidence for recommitment of certain individuals," emphasizing as we have here that the ITA retained critical protections against improper confinement. Id. at 652. Namely, the statute only permitted short durations of commitment, any period of commitment required the State to prove it was warranted, and every petition was required to weigh whether less restrictive alternatives were appropriate. Id. All of these protections remain in place.

Indeed, at oral argument, D.O. acknowledged he was not aware of any precedent prohibiting, on constitutional grounds, the legislature from directing a jury to weigh evidence in this way. Wash. Ct. of Appeals oral argument, supra at 5 min., 25 sec. through 5 min., 36 sec. We decline to do so for the first time here and hold RCW 71.05.285 does not violate the protections of substantive due process. Batson, 196 Wn.2d at 674.

B.     Evidence of D.O.'s guardianship

1.     Allegedly erroneous jury instruction

In a pretrial motion, D.O. proposed a limiting instruction stating, "Guardianship is based on different laws than those that apply to this case. Individuals who have a guardian may not be gravely disabled, and individuals who are gravely disabled may not qualify for guardianship. Do not make any assumptions based on the fact that the respondent has a guardian." Over his objection, the court modified the instruction by adding one word to the third

sentence, namely, "Do not make any assumptions based on the *sole* fact that the respondent has a guardian." (Emphasis added.)

D.O. argues that the court's one-word alteration of his proposed jury instruction was misleading and an error of law which affected the outcome of his case, because the decision to appoint a guardian is predicated on a different legal standard than that for commitment so it would be improper for the jury to base a finding of grave disability on the fact that he had a guardian. We disagree.

"Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and, when read as a whole, properly inform the trier of fact of the applicable law." Helmbreck v. McPhee, 15 Wn. App. 2d 41, 57, 476 P.3d 589 (2020). We review de novo whether a jury instruction correctly states the law. Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 767, 389 P.3d 517 (2017). If an instruction contains a clear misstatement of law, prejudice is presumed, but prejudice must be demonstrated if an instruction is merely *misleading*. Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012). In other words, a misleading instruction does not require reversal without proof the instruction was prejudicial. Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002). And it is the party challenging an instruction that bears the burden of establishing prejudice. Griffin v. W. RS, Inc., 143 Wn.2d 81, 91, 18 P.3d 558 (2001).

D.O's claim fails for three main reasons.

First, we must consider jury instructions in their full context. State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). Reading it so, we note that

the first sentence of the instruction as given flatly states the law governing ITA cases and guardianships are "different." The second sentence reinforces the distinction between the two bodies of law, stating, "Individuals who have a guardian may not be gravely disabled, and individuals who are gravely disabled may not qualify for guardianship." These provisions convey that, while there may be some similarities between these types of actions, the jury is being instructed that they are not equivalent. These are accurate statements of the law and correctly and adequately limited the jury's ability to improperly use his guardianship. Intuitive Surgical, 187 Wn.2d at 767.

Second, the addition of the word "sole" arguably assisted D.O. more than it could have prejudiced him in the context of the court's instructions in their entirety. The court instructed the jury on the numerous elements necessary to find grave disability and that it was the State's burden to establish the need of involuntary commitment. So, the instruction that the jury could not "solely" rely on the fact of his guardianship underscored that it could not do so because the State still needed to establish all those elements for proving grave disability. Again, this is an accurate statement of the law. Intuitive Surgical, 187 Wn.2d at 767.

Third, even if we were to accept D.O.'s argument that the word "sole" changed the substantive meaning of the instruction, he cites no authority for the assertion that the fact of his guardianship could not be used in *any* way by the jury, and that therefore the instruction was misleading or a prejudicial misstatement of law because it did not foreclose its use entirely. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may

13

assume that counsel, after diligent search, has found none." DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

In fact, there were numerous aspects about the fact of his guardianship that were proper for the jury to use. The fact of the guardianship explained the relationship between D.O. and one of the State's four witnesses. And the fact that someone who had been overseeing aspects of his care had recently observed deterioration from his baseline was relevant to his ability to support his needs in the community. We conclude the alteration to D.O.'s proposed instruction was neither legally improper nor misleading.

2. Allegedly erroneous testimony from D.O.'s guardian

In addition to the disagreement on the jury instructions, D.O. filed motions in limine before the trial to exclude any evidence regarding his guardianship as irrelevant and unfairly prejudicial. The court denied them, finding that the evidence was relevant and that any prejudicial effect could be resolved through cross-examination and a limiting instruction.

At trial, his guardian, Gilpin, was one of the four witnesses who testified. Her testimony included an explanation of who she was and what her duties were, e.g., that she was appointed by a court as his advocate to manage his finances, oversee his care, arrange his services, and apply for his benefits. During rebuttal, the State also discussed his guardian and referenced the fact that she managed his finances to counter D.O.'s assertion he was able to make rational choices about his money.

D.O. argues that the probative value of the testimony about his guardianship

and his guardian's duties was minimal. D.O. avers the court abused its discretion in admitting this evidence because it risked confusing and misleading the jury by conflating a guardianship and involuntary detention.

For evidence to be admitted at trial, it must be relevant, i.e., tending to prove or disprove the existence of a fact of consequence to the outcome of the case. ER 402; State v. Weaville, 162 Wn. App. 801, 818, 256 P.3d 426 (2011). But otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. Trial courts have "considerable discretion to consider the relevancy of evidence and to balance 'the probative value of the evidence against its possible prejudicial impact.'" State v. Barry, 184 Wn. App. 790, 801, 339 P.3d 200 (2014) (quoting State v. Rice, 48 Wn. App. 7, 11, 737 P.2d 726 (1987)). We review their ER 403 rulings for abuse of discretion. State v. Caril, 23 Wn. App. 2d 416, 427, 515 P.3d 1036 (2022). A court abuses its discretion if no reasonable person would take the view it adopted. State v. Atsbeha, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001).

Gilpin's personal knowledge of D.O.'s behavior in the community and his ability to provide for his own health and safety outside the structured environment of a medical facility was highly relevant and probative to the State's claims of grave disability. Although the court may have been able to preclude any reference to the sheer fact of the guardianship, it is not an abuse of discretion to find that Gilpin could not reasonably testify without disclosing the nature of her relationship to D.O.

to offer the jury more complete context of her role. D.O. fails to show that no reasonable person would make the same conclusion the trial court did here, namely, that the risk of unfair prejudice from the jury knowing he had a guardian did not "substantially outweigh" the probative value of Gilpin's testimony. Atsbeha, 142 Wn.2d at 914. Pursuant to the considerable discretion in determining the balance of probative value and prejudice we afford trial courts, D.O.'s argument fails. Barry, 184 Wn. App. at 801. [4]

III.    CONCLUSION

We affirm.

_____
Díaz, J.

WE CONCUR:

_____
Coburn, J.

_____
Smith, C.J.

---

[4] In a statement of additional authorities (SAA), the State also newly contends that we should dismiss D.O.'s claim because he was required to notify the Attorney General's office of his constitutional challenge to RCW 71.05.285. We decline to address this assertion because this court does not treat SAAs as an opportunity for parties to offer new arguments that were previously available before its briefing deadlines. O'Neill v. City of Shoreline, 183 Wn. App. 15, 23, 332 P.3d 1099 (2014) (concluding RAP 10.8 was "intended to provide parties an opportunity to cite authority decided *after* the completion of briefing" and stating "[w]e do not view it as being intended to permit parties to submit to the court cases that they failed to timely identify when preparing their briefs." (emphasis added)). The case the State relies on for its new argument was available to it more than one month before it filed its brief on September 3, 2024. Casali v. State of Washington, No. 39426-3-III, slip op. (Wash. Ct. App. Aug. 1, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/394263_ord.pdf.